IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) SAUNDRA FOSTER, as Special Administratrix of the Estate of RENEE RHINE, deceased,<br><br>Plaintiff,<br><br>v.<br><br>(1) TURN KEY HEALTH CLINICS, LLC,<br>(2) ROB FRAZIER, in his official capacity,<br>(3) DOES Nos. 1-10,<br><br>Defendants. | Case No.:  19-CV-166-RAW<br><br>Jury Trial Demanded<br><br>Attorney Lien Claimed |

## COMPLAINT

**COMES NOW**, Plaintiff Saundra Foster ("Plaintiff"), as the Special Administratrix of the Estate of Renee Rhine ("Ms. Rhine"), deceased, and for her causes of action against the above-named Defendants, alleges and states the following:

## PARTIES, JURISDICTION AND VENUE

1. Plaintiff is a citizen of Oklahoma and the duly-appointed Special Administratrix of the Estate of Ms. Rhine. The survival causes of action in this matter are based on violations of Ms. Rhine's rights under the Fourteenth Amendment to the United States Constitution.

2. Defendant Turn Key Health Clinics, LLC ("Turn Key") is an Oklahoma limited liability company doing business in Muskogee County, Oklahoma.  Turn Key is a private correctional health care company that contracts with counties, including, during the pertinent timeframe, Muskogee County, to provide medical professional staffing, supervision and care in county jails. Turn Key was at all times relevant hereto responsible, in part, for providing medical services, supervision and medication to Ms. Rhine while she was in the custody of the Muskogee County Sheriff's Office ("MCSO").  Turn Key was additionally responsible, in part, for creating,

implementing and maintaining policies, practices and protocols that govern the provision of medical and mental health care to inmates at the Muskogee County Jail, and for training and supervising its employees. Turn Key was, at all times relevant hereto, endowed by Muskogee County with powers or functions governmental in nature, such that Turn Key became an agency or instrumentality of the State and subject to its constitutional limitations.

3. Defendant Rob Frazier ("Sheriff Frazier" or "Defendant Frazier") is the Sheriff of Muskogee County, Oklahoma, residing in Muskogee County, Oklahoma and acting under color of state law. Sheriff Frazier is sued purely in his official capacity. It is well-established, as a matter of Tenth Circuit authority, that a § 1983 claim against a county sheriff in his official capacity "is the same as bringing a suit against the county." *Martinez v. Beggs*, 563 F.3d 1082, 1091 (10th Cir. 2009). *See also Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010); *Bame v. Iron Cnty.*, 566 F. App'x 731, 737 (10th Cir. 2014). Thus, in suing Sheriff Frazier in his official capacity, Plaintiff has brought suit against the County/MCSO.

4. Defendants DOES ##1-10 are detention and medical staff, unidentified as this time, and as described more fully below, who committed underlying violations of Ms. Rhine's Constitutional rights.

5. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 to secure protection of and to redress deprivations of rights secured by the Fourteenth Amendment to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law.

6. The jurisdiction of this Court is also invoked under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

7. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## STATEMENT OF FACTS

8. Paragraphs 1-7 are incorporated herein by reference.

9. On May 31, 2017, at approximately 12:30 a.m., Ms. Rhine was booked into the Muskogee County Jail on a misdemeanor charge of "disobeying an officer."

10. During the booking process, Ms. Rhine was given a classification of "detoxification." This classification should have triggered enhanced supervision and treatment protocols. Ms. Rhine had a history of serious mental health problems, including bipolar disorder, schizophrenia, anxiety and depression. On information and belief, it was obvious to booking staff, including Officer Christina Boswell, and the Turn Key booking nurse, that Ms. Rhine was in distress, in danger of withdrawal, and in need of an immediate medical and mental health care evaluation and monitoring.

11. Under Turn Key's own written policies, inmates who are at risk for self-harm or medical problems such as alcohol intoxication or possible drug withdrawal, are, at a minimum, to be placed under enhanced and heightened supervision and to be treated under a Withdrawal Protocol.

12. It is well known that inmates, like Ms. Rhine, "with pre-existing psychiatric conditions may suffer an exacerbation of their illness during detoxification." Federal Bureau of Prisons Clinical Guidance, *Detoxification of Chemically Dependent Inmates.* "A collaborative treatment effort with psychology and psychiatry staff is warranted for management of these inmates." *Id.* However, there was no psychology and psychiatry staff at the Jail, and Ms. Rhine was provided with no mental health or medical management.

13. According to the essential standards of the National Commission on Correctional Health Care ("NCCHC"), "[d]etoxification is done only under physician supervision in accordance with local, state, and federal laws." However, on information and belief, Ms. Rhine's purported

3

"detoxification" was not done under the supervision of a physician.

14. According to NCCHC guidance:

> Those [inmates] who screen positive [for substance use disorders and for potential for acute withdrawal] should receive a complete medical and psychiatric evaluation to assess for and treat physical and mental health comorbidity, pregnancy, hydration, and nutritional status (that can complicate management of withdrawal) and a review of current medications. Evaluation includes assessment of level of consciousness and mental status. Acute intoxication requires close monitoring. A significant alteration or decline in level of consciousness suggests need for hospital transfer because both alcohol, and occasionally, opioid intoxication, can be fatal. Naloxone (e.g., Narcan®) should be readily available to treat opioid intoxication emergencies. Intoxicated inmates should be closely monitored for the development of withdrawal symptoms that may ensue as blood alcohol or opioid levels decline.

*See* https://www.ncchc.org/filebin/Resources/Detoxification-Protocols-2015.pdf.

15. Ms. Rhine did not receive anything approaching the care and supervision set out in the NCCHC guidance. In fact, on information and belief, she received no medical or mental health care or supervision at all.

16. Rather, despite the obvious and known and significant risks or serious harm, Muskogee County Sheriff's Officer ("MCSO") and Turn Key personnel placed Ms. Rhine in general population without and medical or mental health care, treatment or monitoring.

17. After being booked and placed in the Jail, on information and belief, Ms. Rhine continued to exhibit obvious signs and symptoms of acute psychosis and/or withdrawal.

18. On or about June 1, 2017, Ms. Rhine was brutally beaten and physically assaulted by an MCSO jailer, whose identity remains unknown. The MCSO officer repeatedly and violently hit and battered Ms. Rhine with a closed fist and/or blunt force weapon. Accounting for the "legitimate interests [stemming from the government's] need to manage the facility in which the individual is detained," the violent force used on Ms. Rhine was excessive and objectively unreasonable. The violent force was utterly disproportionate to any legitimate interest in managing the Jail. Ms. Rhone was beaten so badly that she lost consciousness and "blacked out".

4

She suffered multiple serious injuries, including contusions, bruising, a ruptured spleen and hemoperitoneum.

19. A ruptured spleen is a medical emergency that occurs as a result of a break in in the spleen's surface. The spleen, situated just under the rib cage on your left side, helps fight infection and filter old blood cells from the bloodstream. A forceful blow to the abdomen is the usual cause of a ruptured spleen.

20. Signs and symptoms of a ruptured spleen include pain in the upper left abdomen, tenderness when you touch the upper left abdomen, left shoulder pain and confusion, lightheadedness or dizziness.

21. Hemoperitoneum is a type of internal bleeding. More specifically, hemoperitoneum is a condition where blood accumulates in the space between the inner lining of the abdominal wall and the internal abdominal organs. In layman's terms, hemoperitoneum is blood in the belly.

22. When not treated promptly, serious complications can arise from hemoperitoneum. It's possible for blood to accumulate in the cavity extremely quickly. This can cause shock from blood loss and even result in death.

23. Some symptoms of hemoperitoneum include: tenderness at the site of the abdomen, sharp or stabbing pain in the pelvic area and dizziness or confusion.

24. Recognized causes of hemoperitoneum include blunt trauma or injury to the spleen.

25. After Ms. Rhine was assaulted by the MCSO officer, she should have been immediately transported to a hospital. She was not. Rather, in deliberate indifference to Ms. Rhine's serious medical needs, she was not transported to a hospital and was not provided with any medical attention whatsoever.

26. After being assaulted, Ms. Rhine complained to detention staff and Turn Key medical staff at the Jail that he was in extreme pain, that she was bruised and that she was feeling dizzy or

nauseous. On information and belief, Ms. Rhine exhibited signs of mental confusion.  In addition, Ms. Rhine was clearly unable to walk or stand.  She was in and out of consciousness. At one point on or about June 1, Ms. Rhine completely lost her balance and fell at the Jail.  Though more than one MCSO employee was present and witnessed Ms. Rhine fall, they did nothing to help her.

27. Ms. Rhine's condition, due to injuries from the assault, loss of a consciousness and fall was an emergent situation requiring immediate transfer to a hospital.  However, MSCO detention staff and Turn Key medical staff alike were deliberately indifferent to the obvious and substantial risks to Ms. Rhine's health and safety.  She was provided with no medical attention or assistance at all.

28. On information and belief, from the time that Ms. Rhine was assaulted and fell on June 1, 2017 to the time that she left the Jail at approximately 12:00 p.m. on June 2, 2017, she was disorientated, unsteady on her feet, confused, visibly injured and in obvious and extreme pain.

29. On information and belief, from the time that Ms. Rhine was assaulted and fell on June 1, 2017 to the time that she left the Jail at approximately 12:00 p.m. on June 2, 2017, she continually complained to MCSO detention staff and Turn Key medical staff that she has been assaulted, was in extreme pain and needed medical attention.

30.   On information and belief, from the time that Ms. Rhine was assaulted and fell on June 1, 2017 to the time that she left the Jail at approximately 12:00 p.m. on June 2, 2017, the MCSO detention staff and Turn Key medical staff that came into contact with Ms. Rhine were deliberately indifferent to her serious medical needs by failing and refusing to provide her with any medical assistance, attention or referral.

31.  On June 2, 2017, at approximately noon, Ms. Rhine was released from the Jail on bond.

32. At the time of her release, Ms. Rhine was disoriented, confused and incoherent due to her injuries and mental health conditions.  On information and belief, due to her exhaustion, injuries and disorientation, Ms. Rhine went home only to be taken away by EMS on the evening of June

3, 2017.

33. On June 3, 2017, Ms. Rhine presented at the Saint Francis Hospital – Muskogee. When she arrived at the hospital, Ms. Rhine reported to the health care professionals at Saint Francis-Muskogee that she was "beat up" or "assaulted" by an officer at the Jail on or about June 1, 2017, and that she subsequently "blacked out".

34. Ms. Rhine initially presented with severe abdominal and chest pain, pain in her left arm and bruising from the assault. She was weak and barely able to walk.

35. Medical staff at the hospital found that Ms. Rhine had suffered a "grade III splenic laceration" and had hemoperitoneum. Hospital medical staff further determined that Ms. Rhine had elevated troponin, which is a sign of an acute coronary event. Dr. Madhulika Krish concluded that the elevated troponin possibly resulted from a contusion.

36. Ms. Rhine was subsequently admitted to the Intensive Care Unit ("ICU") in critical condition. Over the course of the next couple of days at the hospital, Ms. Rhine received blood transfusions to treat her low hemoglobin. By day 3 at the hospital, her hemoglobin dropped dangerously, requiring emergency surgery.

37. On June 7, 2017, Ms. Rhine went into surgery for her splenic laceration and to evacuate the hemoperitoneum. The surgery, performed by Dr. Caleb Harris, was initially successful.

38. Ms. Rhine temporarily left the hospital and was admitted back again on June 12, 2017 in respiratory distress.

39. Ms. Rhine continued to struggle with her health until the date of her death on December 1, 2017.

40. The excessive use of force and deliberate indifference to Ms. Rhine's serious medical needs, as described herein were a proximate cause of her physical and mental pain and suffering, a worsening of her condition, and ultimately, her death.

41. The excessive use of violent force, as summarized *supra*, was in furtherance of and consistent with policies, customs and/or practices for which the County/MCSO promulgated, created, implemented or possessed responsibility for the continued operation of.

42. There is a long and deep-seated history of an unabated custom of excessive force at the Muskogee County Jail.

43. For instance, in February 2014, a former Muskogee County jail superintendent and assistant superintendent, Raymond A. Barnes and Christopher A. Brown, were convicted in this Court on several counts each of civil-rights offenses related to excessive force used against multiple inmates. Barnes and Brown were also were found guilty of "conspiring to violate the rights of inmates" by assaulting them or directing other jailers to do so.

44. An investigation revealed that Barnes and Brown reportedly organized so-called "meet and greets," at which they would throw and slam to the ground incoming inmates upon their arrival and then threatened to fire Jail employees for reporting the abuse.

45. The conduct of Barnes and Brown, two supervisors at the Jail, is evidence of a widespread pattern and custom of unconstitutional misconduct, as well as clear and utter failures to train and supervise MCSO Jail staff with respect to the proper use of force.

46. On information and belief, the pattern and custom of unconstitutional excessive force, and inadequate training and supervision, continued at the Jail after Barnes and Brown were indicted.

47. For instance, a civil rights lawsuit was filed against Muskogee County on behalf of the Estate of Marvin A. Rowell. *See* Case No. 18-CV-125-RAW. In that case, it is alleged that on January 30, 2016, when Rowell was a pretrial detainee at the Muskogee County Jail, Detention Center, he was placed in a restraint chair and subjected to unjustified and excessive force at the hands of an MCSO jailer, Dakota West. The plaintiff further alleges that Rowell died as a result of his injuries and that MCSO has failed to adequately train and supervise its employees with

respect to the use of force.

48. In another lawsuit against Muskogee County, it is alleged that, on March 22, 2017, a former inmate, Daniel Thornburg, was brutally beaten and attacked by three other inmates at the suggestion, request and direction of MCSO jailer, Lonnie Hall. *See* Case No. 19-CV-87-SPS.

49. In yet another civil rights lawsuit, it was alleged that in June 2015, a female inmate, Ashley Wayman, was physically assaulted by MCSO jailer, Harold Shinn.

50. As stated *supra*, Ms. Rhine was brutally assaulted by an MCSO jailer on or about June 1, 2017.

51. Plainly, the unconstitutional conditions in place at the Jail under the supervision Barnes and Brown did not abate after their indictment.

52. There is a causal link between the above described policies and customs, with respect to the use of force, and Ms. Rhine's Constitutional injuries.

53. MSCO/Muskogee County knew of, or should have known of, excessive risks to the health and safety of inmates like Ms. Rhine, but failed to take reasonable measures to alleviate those risks.

54. Moreover, the deliberate indifference to Ms. Rhine's serious medical needs, as summarized *supra*, was in furtherance of and consistent with policies, customs and/or practices which the County/MCSO and Turn Key promulgated, created, implemented or possessed responsibility for the continued operation of.

55. For a time in recent years, Defendant Turn Key was the largest private medical care provider to county jails in the state. Turn Key used its political connections to obtain contracts in a number of counties, including Muskogee County, Tulsa County, Garfield County and Creek County.

56. Turn Key and the contracting counties, including Muskogee County, utilized common industry cost-cutting techniques which create financial disincentives to send inmates to outside

medical facilities. Under the contractual arrangements between Turn Key and the counties, there is a financial cap on the amount that can be spent on outside medical care, and any amount over this cap is incurred by Turn Key. Thus, the less inmates are sent to the emergency room, or other outside medical provider, the more money Turn Key pockets.

57. Turn Key also has a policy, practice or custom of understaffing county jails, including the Muskogee County Jail, with undertrained and underqualified medical personnel who are ill-equipped to evaluate, assess, supervise, monitor or treat inmates, like Ms. Rhine, with complex and serious medical needs.

58. In addition, MCSO has utterly failed to train its detention staff in how to properly care for or supervise inmates, like Ms. Rhine, with complex or serious medical needs, with deliberate indifference to the health and safety of those inmates.

59. Turn Key has no protocol or clear policy with respect to the medical monitoring and care of inmates with complex or serious medical needs, and provides no guidance to its medical staff regarding the appropriate standards of care with respect to inmates with complex or serious medical needs.

60. Turn Key's inadequate or non-existent policies and customs were a moving force behind the constitutional violations and injuries alleged herein.

61. Turn Key's corporate policies, practices and customs as described *supra*, have resulted in deaths or negative medical outcomes in numerous cases, in addition to Ms. Rhine's.

62. For instance, in June 2016, a nurse who worked for Turn Key at the Garfield County Jail allegedly did nothing to intervene while a hallucinating man was kept in a restraint chair for more than 48 hours. That man, Anthony Huff, ultimately died restrained in the chair.

63. An El Reno man died in 2016 after being found naked, unconscious and covered in his own waste in a cell at the Canadian County Detention Center, while ostensibly under the care of

Turn Key medical staff. The Office of the Chief Medical Examiner found the man had experienced a seizure in the days before his death.

64. A man in the Creek County Jail, also under the purported "care" of Turn Key, died in September 2016 from a blood clot in his lungs after his repeated complaints -- over several days -- of breathing problems were disregarded by responsible staff, and he lost consciousness.

65. Another man, Michael Edwin Smith, encountered deliberate indifference to his serious medical needs at the Muskogee County Jail in the summer of 2016. Mr. Smith became permanently paralyzed when Jail staff failed to provide him medical treatment after he repeatedly complained of severe pain in his back and chest, as well as numbness and tingling. Smith claims that cancer spread to his spine, causing a dangerous spinal compression, a condition that can cause permanent paralysis if left untreated. Smith asserts that he told the Turn Key-employed physician at the Jail that he was paralyzed, but the physician laughed at Smith and told him he was faking. For a week before he was able to bond out of Jail, Smith was kept in an isolation cell on his back, paralyzed, unable to walk, bathe himself or use the bathroom on his own. He lay in his own urine and feces because Jail staff told Smith he was faking paralysis and refused to help him.

66. In November of 2016, MCSO and Turn Key staff disregarded, for days, the complaints and medical history of inmate James Douglas Buchanan. As noted by Clinton Baird, M.D., a spinal surgeon,

> [Mr. Buchanan] is a 54-year-old gentleman who had a very complicated history… [H]e was involved in being struck by a car while riding bicycle several weeks ago. … ***He ended up finding himself in jail and it was during this time in jail that he had very significant clinical deterioration in his neurologic status. [I]t is obvious that he likely developed the beginnings of cervical epidural abscess infection*** in result of his critical illness [and] hospitalization, but then ***while in <u>jail</u>, he deteriorated significantly and his <u>clinical deterioration</u> <u>went</u> <u>unrecognized</u> <u>and</u> <u>untreated</u> until he was nearly completely quadriplegic.***

(emphasis added).

11

67. Mr. Smith and Mr. Buchanan's unconstitutional mistreatment put Turn Key, MCSO and the County on notice that the medical care and supervision provided by Turn Key and the detention staff was wholly inadequate and placed inmates like Ms. Rhine at excessive risk of harm. However, MCSO and the County failed to alleviate the known and obvious risks in deliberate indifference to the rights of inmates like Ms. Rhine.

68. Turn Key has maintained a custom of inadequate medical care at a corporate level which poses excessive risks to the health and safety of inmates like Ms. Rhine.

## CAUSES OF ACTION

### VIOLATION OF THE FOURTEENTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
### (42 U.S.C. § 1983)

69. Paragraphs 1-68 are incorporated herein by reference.

### A. Underlying Violations of Constitutional Rights

■ **Excessive Use of Force**

70. At the time of the complained events, Ms. Rhine, as a pretrial detainee, had a clearly established constitutional right under the Fourteenth Amendment to be secure in her person and free from objectively unreasonable excessive force to injure her and her bodily integrity.

71. Any reasonable officer knew or should have known those rights at the time of the complained of conduct as they were clearly established.

72. At the time the violent physical force was used by the unidentified MCSO officer, Ms. Rhone posed no threat of serious physical harm to herself or others and that violent force was unnecessary to restrain Ms. Rhine or secure the safety of officers.

73. Accounting for the "legitimate interests [stemming from the government's] need to manage the facility in which the individual is detained," the violent force used on Ms. Rhine was excessive

and objectively unreasonable. The violent force was utterly disproportionate to any legitimate interest in managing the Jail.

74. The excessive force described herein was a proximate cause of Ms. Rhine's unnecessary physical pain, emergent physical injuries and illness, a worsening of her condition, severe emotional distress, mental anguish, a loss of quality and enjoyment of life, terror, degradation, oppression, humiliation, embarrassment, hospital, surgical and other medical expenses, and ultimately contributed to her death.

- **Deliberate Indifference to Serious Medical Needs**

75. The MCSO and Turn Key staff who came into contact with Ms. Rhine, as described above, knew there was a strong likelihood that Ms. Rhine was in danger of serious personal harm due to her recent assault, medical and mental health history, complaints of pain and injury, mental confusion and incoherence, difficultly walking and standing, loss of consciousness and fall.

76. As described *supra*, Ms. Rhine had serious and emergent medical issues that were known and obvious to the MCSO and Turn Key employees/agents who came into contact with her. It was obvious that Ms. Rhine needed immediate and emergent evaluation and treatment in an emergency room setting, but such services were denied, delayed and obstructed. The MCSO and Turn Key employees/agents who came into contact with Ms. Rhine disregarded the known, obvious and substantial risks to her health and safety.

77. As a direct and proximate result of this deliberate indifference, as described above, Ms. Rhine experienced unnecessary physical pain, a worsening of her condition, severe emotional distress, mental anguish, a loss of quality and enjoyment of life, terror, degradation, oppression, humiliation, embarrassment, hospital, surgical and other medical expenses, and ultimately contributed to her death.

78. As a direct and proximate result of Defendants' conduct Ms. Rhine has suffered damages

and is entitled to pecuniary and compensatory damages. Ms. Rhine is entitled to damages due to the deprivation of her rights secured by the U.S. Constitution.

### B. Municipal/"Monell" Liability (Against Turn Key)[1]

79. Paragraphs 1-78 are incorporated herein by reference.

80. Turn Key is a "person" for purposes of 42 U.S.C. § 1983.[2]

81. At all times pertinent hereto, Turn Key was acting under color of state law.

82. Turn Key has been endowed by Muskogee County with powers or functions governmental in nature, such that Turn Key became an instrumentality of the State and subject to its constitutional limitations.

83. Turn Key is charged with implementing and assisting in developing the policies of MCSO with respect to the medical and mental health care of inmates at the Muskogee County Jail and has shared responsibility to adequately train and supervise its employees.

84. In addition, Turn Key implements, maintains and imposes its own corporate policies, practices, protocols and customs at the Jail.

85. There is an affirmative causal link between the aforementioned acts and/or omissions of Turn Key medical staff, as described above, in being deliberately indifferent to Ms. Rhine's serious

---

[1] "A municipal entity may be liable where its policy is the moving force behind the denial of a constitutional right, *see Monell* [*v. New York City Dept. of Social Servs.*, 436 U.S. 658, 694 (1977), 98 S.Ct. 2018], **or** for an action by an authority with final policy making authority, *see Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 482–83, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)." *Revilla v. Glanz*, 8 F. Supp. 3d 1336, 1339 (N.D. Okla. 2014) (emphasis added). Plaintiff's municipal liability claim in this action is based upon a *Monell* theory of liability, thus he need not establish that Turn Key had final policymaking authority for Muskogee County.

[2] "Although the Supreme Court's interpretation of § 1983 in *Monell* applied to municipal governments and not to private entities acting under color of state law, case law from [the Tenth Circuit] and other circuits *has extended the Monell doctrine to private § 1983 defendants*." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003) (citations omitted) (emphasis added). *See also, Smedley v. Corr. Corp. of Am.*, 175 F. App'x 943, 946 (10th Cir. 2005).

medical needs, health, and safety, and the above-described customs, policies, and/or practices carried out by Turn Key (*See, e.g.,* ¶¶ 54-68, *supra*).

86.  Turn Key knew or should have known, either through actual or constructive knowledge, or it was obvious, that these policies, practices and/or customs posed substantial risks to the health and safety of inmates like Ms. Rhine.  Nevertheless, Turn Key failed to take reasonable steps to alleviate those risks, in deliberate indifference to inmates', including Ms. Rhine's, serious medical needs.

87.  Turn Key tacitly encouraged, ratified, and/or approved of the acts and/or omissions alleged herein.

88.  There is an affirmative causal link between the aforementioned customs, policies, and/or practices and Ms. Rhine's injuries and damages as alleged herein.

### C.  Official Capacity Liability (Against Sheriff Frazier)

89.  Paragraphs 1-88 are incorporated herein by reference.

■ **Excessive Use of Force**

90.  The aforementioned acts of excessive force are causally connected with customs, practices, and policies which the County/MCSO promulgated, created, implemented and/or possessed responsibility for.

91.  Such policies, customs and/or practices are specifically set forth in paragraphs 41-53, *supra*.

92.  The County/MCSO, through its continued encouragement, ratification, approval and/or maintenance of the aforementioned policies, customs, and/or practices; in spite of their known and obvious inadequacies and dangers; has been deliberately indifferent to inmates', including Ms. Rhine's, health and safety.

93. As a direct and proximate result of the aforementioned customs, policies, and/or practices, Ms. Rhine suffered injuries and damages as alleged herein.

### ■ Deliberate Indifference to Serious Medical Needs

94. The aforementioned acts and/or omissions of MCSO and/or Turn Key staff in being deliberately indifferent to Ms. Rhine's health and safety and violating Ms. Rhine's civil rights are causally connected with customs, practices, and policies which the County/MCSO promulgated, created, implemented and/or possessed responsibility for.

95. Such policies, customs and/or practices are specifically set forth in paragraphs 54-68, *supra.*

96. The County/MCSO, through its continued encouragement, ratification, approval and/or maintenance of the aforementioned policies, customs, and/or practices; in spite of their known and obvious inadequacies and dangers; has been deliberately indifferent to inmates', including Ms. Rhine's, health and safety.

97. As a direct and proximate result of the aforementioned customs, policies, and/or practices, Ms. Rhine suffered injuries and damages as alleged herein.

**WHERFORE,** based on the foregoing, Plaintiff prays this Court grant the relief sought, including but not limited to actual and compensatory damages in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing suit, the costs of bringing this action, a reasonable attorneys' fee, along with such other relief as is deemed just and equitable.

Respectfully submitted,

**SMOLEN & ROYTMAN**

/s/Daniel E. Smolen
Daniel E. Smolen, OBA #19943
Robert M. Blakemore, OBA #18656
701 S. Cincinnati Avenue
Tulsa, Oklahoma 74119
(918) 585-2667 P

(918) 585-2669 F
danielsmolen@ssrok.com
bobblakemore@ssrok.com
***Attorneys for Plaintiff***